IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| ROBERT EARL COUNCIL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL CASE NO. 2:23-cv-730-ECM |
| | ) | [WO] |
| COMMISSIONER JOHN HAMM, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION and ORDER**

## I. INTRODUCTION

This case arises out of alleged retaliatory actions taken by Alabama Department of Corrections ("ADOC") officials and staff toward prisoner-activist Robert Earl Council. Based on these allegations, Council brings federal and state claims against nineteen ADOC defendants in their individual capacities.

On the federal side, Council brings three claims pursuant to 42 U.S.C. § 1983. First, Council alleges that former ADOC Commissioner John Hamm, former ADOC Commissioner Jefferson Dunn, former ADOC Institutional Coordinator Cheryl Price, ADOC Institutional Coordinator Edward Ellington, Warden Deborah Toney, Warden William Streeter, Warden Chadwick Crabtree, Lieutenant Shannon Caldwell, Lieutenant Jeremy Pelzer, Correctional Officer Dustin Brewer, Correctional Officer Sean Bright, Correctional Officer Demetrius Charley, Correctional Officer Shamarion Dozier, Lieutenant Hanser Whitfield, Lieutenant Mike Jones, and Lieutenant Everett Gilbert

retaliated against him for protected activity in violation of the First Amendment.[1] (Doc. 85 at 25–26, paras. 169–72). Second, Council alleges deliberate indifference to life-threating conditions of confinement by Dunn, Hamm, Price, Ellington, Crabtree, and Pelzer in violation of the Eighth Amendment. (*Id.* at 27–28, paras. 173–76). Third, Council alleges that Correctional Emergency Response Team ("CERT") Officer Christopher Collins, CERT Officer Christopher Simpson, Brewer, and Jones assaulted him in violation of the Eighth Amendment. (*Id.* at 28, paras. 177–79).

Council also brings three claims under Alabama law: (1) assault and battery—against Officer Brewer, Lieutenant Jones, Officer Collins, Correctional Officer Steven Parker, and Officer Simpson; (2) intentional infliction of emotional distress—against Lieutenant Pelzer, Officer Charley, Officer Gilbert, and Officer Bright; and (3) negligent retention or supervision of Pelzer—against Commissioner Dunn, Commissioner Hamm, Coordinator Price, Coordinator Ellington, Warden Toney, Warden Streeter, and Warden Crabtree. (*Id.* at 29–31, paras. 180–99).

The Defendants collectively move to dismiss Council's third amended complaint (the "Complaint") in its entirety. (Doc. 87). The parties have fully briefed the motion. (*See*

[1] Officer Dozier did not join the motion and has not appeared in the case. Moreover, the record does not reflect that Officer Dozier has been served. Federal Rule of Civil Procedure 4(m) provides that the Court must dismiss the case against a defendant without prejudice if that defendant "is not served within 90 days after the complaint is filed." On September 8, 2026, the Court ordered Council to show cause as to why Officer Dozier "should not be dismissed from this case for failure to prosecute" pursuant to Rule 4(m). (Doc. 96 at 1). Council responded on September 22, 2026, stating that he "does not oppose dismissal of Defendant Dozier." (Doc. 97 at 1). Accordingly, Officer Dozier is DISMISSED without prejudice for failure to prosecute and when the Court references the "Defendants" in this Opinion, that reference is to all defendants except Dozier.

docs. 88, 91, 95). After a thorough review of the record, and for good cause, the Defendants' motion is due to be GRANTED in part and DENIED in part.

## II. JURISDICTION AND VENUE

The Court has original subject matter jurisdiction over Council's federal claims under 28 U.S.C. §§ 1331 and 1343, and supplemental jurisdiction over Council's state law claims under 28 U.S.C. § 1367. Personal jurisdiction and venue are uncontested, and the Court concludes that venue properly lies in the Middle District of Alabama. *See* 28 U.S.C. § 1391.

## III. STANDARD OF REVIEW

A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint against the legal standard set forth in Rule 8: "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678. Conclusory allegations that are merely "conceivable" and fail to rise "above the speculative level" are insufficient to meet the plausibility standard. *Twombly*, 550 U.S. at 555–56. This pleading standard "does not require 'detailed factual allegations,' but it demands more than an

unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. Indeed, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

Moreover, in evaluating the sufficiency of a plaintiff's pleadings, the Court must indulge reasonable inferences in a plaintiff's favor, but it is "not required to draw [a] plaintiff's inference." *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1248 (11th Cir. 2005) (per curiam). Similarly, "unwarranted deductions of fact" in a complaint are not admitted as true for the purpose of testing the sufficiency of a plaintiff's allegations. *Id.*; *see also Iqbal*, 556 U.S. at 681 (stating conclusory allegations are "not entitled to be assumed true").

## IV. FACTUAL BACKGROUND[2]

Council has been incarcerated in ADOC facilities since 1995. (Doc. 85 at 3, para. 1). Council's complaint provides an incomplete and sometimes meandering account of Council's incarceration within the ADOC from 2019 to 2023. Because the Court will not rewrite otherwise deficient pleadings to sustain this action, the Court merely recites and summarizes the allegations, as given, in the complaint.

Council is a self-identified activist. In 2014, Council cofounded the Free Alabama Movement ("FAM"), whose mission is the "peaceful protest of and resistance to unconstitutional confinement, conditions, and forced labor," by "strikes, boycotts, protests,

[2] At the motion to dismiss stage, the Court "must view the [operative] complaint in the light most favorable to [Council] and accept all of [Council]'s well-pleaded facts as true." *Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1057 (11th Cir. 2007) (citation omitted).

and social-media campaigns." (Doc. 85 at 3, para. 2; 9, para. 32). In addition, Council assists other prisoners in "access[ing] legal resources and challeng[ing] ADOC's constitutional violations." (*Id.* at 9, para. 34).

In March 2019, Council was transferred to the general population of the Limestone Correctional Facility ("Limestone"), "a maximum-security prison" in north Alabama. (*Id.* at 10, paras. 39–40). Limestone "is the largest prison" in Alabama and "consistently reports more assaults . . . than any other facility within the ADOC." (*Id.* at 10, paras 40–41). Council alleges that "ADOC officials have often used transfers to Limestone and/or placement in its restrictive housing unit to retaliate against and/or quiet high-profile prisoner activists." (*Id.* at 10, para. 43). The ADOC previously "transferred prisoner-activist Juan Caples to Limestone, placing him in restrictive housing . . . for more than two years." (*Id.* at 10, para. 44). The ADOC also previously transferred "[a]nother prisoner who objected to breaking a prisoner-work-strike . . . to Limestone and placed [him] in restrictive housing for several months." (*Id.* at 10, para. 45).

While at Limestone, Council continued his activism. In April 2019, Council "helped publicize the existence of a "'bucket detail' at Limestone—a . . . contraband-search practice in which inmates newly transferred to Limestone were shackled, placed in a restrictive housing cell, and required to defecate in a bucket three times before being released to general population." (*Id.* at 11, para. 48). In July 2019, Council "helped another inmate file a lawsuit against . . . [Lieutenant] Pelzer and other Limestone security staff alleging that . . . Pelzer used excessive force against the inmate." (*Id.* at 11, para. 49). And in

October 2019, Council "helped publicize the existence of a gambling operation within [Limestone] run by . . . Pelzer and other . . . security staff." (*Id.* at 11, para. 50).

According to Council, his activism came at a cost. On October 29, 2019, Council "was charged with several disciplinaries and placed in restrictive housing" at Limestone. (*Id.* at 11, para. 51). Council alleges that these "disciplinaries stemmed from a targeted search, or 'shakedown,' of his cell, during which [Officer] Brewer allegedly discovered drugs." (*Id.*). And that he was actually "placed in restrictive housing in retaliation for his activism and in an attempt to reduce his power and influence among Limestone's prisoner population." (*Id.*).

Council alleges further reprisal and threats in connection with his activism. For instance, the ADOC designated Melvin Ray, the cofounder of FAM, as an "'enemy'" of Council, "preventing the two men from being housed at the same facility." (*Id.* at 9–10, para. 38). But Council "and [his cofounder] are not enemies and have always been friendly." (*Id.*). And "[i]n early November 2019, another inmate told [Council] that . . . [Lieutenant] Pelzer believed [Council] was involved in activism that might cause . . . Pelzer to lose his job and that . . . Pelzer intended to violently retaliate against [Council]." (*Id.* at 11, para. 52).

In January 2020, Council's attorney notified Coordinator Price[3] of Council's treatment at Limestone and requested his transfer. (Doc. 85 at 11, para. 53). That same

[3] Coordinator Price "was a Correctional Institutional Coordinator for the ADOC until approximately 2022. As an Institutional Coordinator, Defendant Price was responsible for planning, monitoring, and reviewing the day-to-day operations of correctional institutions in her assigned area." (Doc. 85 at 5, para. 13). She "also served as the liaison between wardens and the ADOC executive leadership." (*Id.*).

month, Council "filed a complaint under ADOC Administrative Regulation 208 [alleging] the failure of Limestone supervisory officials to investigate . . . [Lieutenant] Pelzer's and . . . [Officer] Brewer's retaliation," and sent a copy to Commissioner Dunn.[4] (Doc. 85 at 11–12, para. 54).

Council took further action. In September 2020, Council filed a lawsuit[5] against, *inter alia*, Lieutenant Pelzer, Officer Brewer, Commissioner Dunn, Warden Toney, and Coordinator Price, "alleg[ing] that they retaliated against him for filing lawsuits against . . . Pelzer and exposing corruption at Limestone."[6] (Doc. 85 at 12, para. 55). And in February 2022, Council "filed a complaint under ADOC Administrative Regulation 208 against several ADOC officials for [alleged] due process violations . . . at Limestone." (*Id.* at 12, para. 56).

At some point between September 2020 and December 2021, the ADOC transferred Council out of Limestone with him eventually ending up at Donaldson Correctional Facility. (*See id.* at 9, para. 36; *id.* at 12, para. 59). There, on January 30, 2021, Council requested that officers "stop beating another prisoner." (*Id.* at 9, para. 36). The officers responded by "str[iking Council] in the back of the head."[7] (Doc. 85 at 9, para. 36). Council suffered "a cracked skull and broken ribs, and permanently lost sight in his left eye." (*Id.*).

---

[4] Commissioner Dunn "was Commissioner of the ADOC from April 1, 2015, until December 2021." (Doc. 85 at 5, para. 11).

[5] *Council v. Pelzer*, No. 2:20-cv-01439 (N.D. Ala.).

[6] Warden Toney "was the Warden of Limestone until March 2022." (Doc. 85 at 6, para. 15).

[7] These officers are not defendants in this case and their actions in January 2021 do not serve as the basis for any claims asserted in Council's third amended complaint. For purposes of this case, it is merely background information.

Later that year, on December 17, 2021, the ADOC transferred Council back to Limestone at the order and direction of Coordinator Price. (*Id.* at 12–13, paras. 59, 62). Upon arrival, Council was "eligible to be housed in general population" but Officer "Bright told [Council] that[] as a Christmas present, [he] would be placed in . . . a restrictive housing cell." (*Id.* at 13, paras. 60–61). "Council and . . . Bright had a verbal altercation" during which Council "used an expletive." (*Id.* at 13, para. 63). The placement in restrictive housing was done at the order of Lieutenant Caldwell, who "supervises the restrictive housing unit." (*Id.* at 13, para. 62). The restrictive housing cell that Council was placed in "was . . . covered with pepper spray and gas chemicals," "was poorly ventilated," and Council was without "materials to clean the cell." (*Id.* at 13, para. 65–67). Council suffered "burning on his skin and in his eyes and airways." (*Id.* at 13, para. 67).

Around that time, Council heard further explanation as to why he was placed in restrictive housing:

> Limestone classification specialists Ricky Smith and Michael Duffey told Plaintiff that he was in restrictive housing because members of the Limestone administration, including . . . [Warden] Toney, [Warden] Streeter, and [Lieutenant] Caldwell, as well as Correctional Captain Denice McKenzie[,] Limestone's head of mental health[,] Limestone's head of classification[,] and shift supervisors[,] had jointly decided they did not want [Council] placed in general population.

(*Id.* at 13–14, para. 68).

A series of disciplinary actions occurred over the next few weeks. On December 20, 2021, Officer Charley and Officer Dozier "conducted a shakedown of [Council]'s cell and found one . . . cigarette" which "had been given to [Council] by another

Limestone correctional officer." (*Id.* at 14, para. 69). At 3:00 a.m. on December 22, 2021, Officer "Brewer served [Council] with a disciplinary for possession of contraband" which "was never prosecuted." (*Id.* at 14, para. 70). The next week, on December 27, 2021, Council "was served with a[nother] disciplinary charging [him] with insubordination for cursing at . . . [Officer] Bright . . . ten days earlier." (*Id.* at 14, para. 71). Lieutenant Caldwell told Council that the disciplinary was "voided." (*Id.* at 14, para. 72). On January 7, 2022, Council was released to general population. (*Id.* at 14, para. 73). A week later, Council was served with another disciplinary for the cursing incident and "told that his previous disciplinary had been reinstated." (*Id.* at 14, para. 74).

A disciplinary hearing was held in January 2022, with Lieutenant Whitfield as hearing officer and Officer Bright as arresting officer. (*Id.* at 14, paras. 76–77). Whitfield found Council guilty over his "object[ion] that the disciplinary had previously been voided and that . . . ADOC's administrative regulations prevent[ed] it from being reinstated." (*Id.* at 15, 78–79). That same day, Council was placed back in restrictive housing without explanation. (*Id.* at 15, para. 81). A few days later, Warden Streeter approved the finding of guilt. (*Id.* at 15, para. 80).

On January 31, 2022, Lieutenant Caldwell told Council's mother "that ADOC officials . . . had directed that [Council] be placed in restrictive housing for speaking to a journalist and because of [his] disciplinary." (*Id.* at 15, para. 82). On February 10, 2022, ADOC "denied that any prisoner had been disciplined or retaliated against for speaking to a journalist and said that ADOC regulations permitted prisoners to communicate with the media." (*Id.* at 15, para. 83). That same day, Council "received a detention notification

informing him that he had been placed in restrictive housing pending an investigation by ADOC[] . . . into why so many people had called the prison to ask why [he] had been placed in restrictive housing." (*Id.* at 15, para. 84).

Council continued to lodge objections against the ADOC and its staff. To that end, on February 21, 2022, Council "filed a complaint under ADOC's Administrative Regulation 208 against several ADOC officials alleging retaliation." (*Id.* at 15, para. 86). And in April 2022, Council was transferred back to general population at Limestone. (*Id.* at 15, para. 87).

Council's activism stretched beyond Limestone's walls. "On September 26, 2022, prisoners at Limestone and across all of . . . ADOC's thirteen major correctional facilities went on strike, protesting their forced labor and demanding an improvement in prison conditions." (*Id.* at 16, para. 88). Council "was seen by both ADOC officials and prisoners as a de facto leader of the strikes." (*Id.* at 16, para. 89). "Limestone administrators sent a group of prisoners to negotiate with [Council], asking that he recommend that prisoners stop the strike. [Council] rejected their offer and continued to encourage prisoners to strike." (*Id.* at 16, para. 90). Lieutenant Pelzer "held a similar meeting several days later between [Council] and three other prisoners" and "asked that the prisoners encourage an end to the strike." (*Id.* at 16, para. 91). The prisoners did not do so; Pelzer directed that the three other prisoners be moved to restrictive housing. (*Id.* at 16, para. 92).

Shortly thereafter, on September 28, 2022, ADOC personnel "conducted a shakedown of [Council]'s cell" where Council "submitted to a strip search." (*Id.* at 16, paras. 93–94; *id.* at 28, para. 178). "During the search [Council] was told he would be

moved to restrictive housing." (*Id.* at 16, para. 95). Council "did not initiate physical contact with any officer, he had no weapon, and he did not demonstrate any assaultive behavior towards any officer." (*Id.* at 17, para. 97).

> [Council] stated that he had broken no ADOC rule, and asked to speak with a supervisor. . . . [Officers] Collins and Simpson grabbed [Council]'s wrist, twisted [his] arm behind his back, and placed him in handcuffs. [Council] was then dragged by an arm and a leg across the dorm, placed on top of a trash cart, and wheeled to the health care unit for a body chart.[8]

(*Id.* at 16–17, para. 96). However, once in the health unit, "employees . . . refused to give [Council] a body chart," and he was sent to restrictive housing. (*Id.* at 17, paras. 98–99).

On October 17, 2022, without any notice, "a disciplinary hearing was held for several disciplinaries [Council] had been charged with because of his alleged actions on September 28, 2022." (*Id.* at 17, paras. 103–05). Lieutenant Jones, the hearing officer, conducted the hearing over Council's objection "that he had not been notified of the disciplinary charges or hearing and that he did not know the charges against him." (*Id.* at 17–18, paras. 106–08). Lieutenant Pelzer, the charging officer, had not been present at the time of the alleged assaultive behavior that Council was charged for, and Council objected to his testimony on the basis that he lacked firsthand knowledge. (*Id.* at 18, paras. 109–111). Over his objections to proceeding without notice and Pelzer's testimony, Jones found Council guilty. (*Id.* at 18, para. 112). On November 2, 2022, Warden "Streeter approved the findings of guilt." (*Id.* at 18, para. 114).

[8] Warden Streeter was present and witnessed these events. (Doc. 85 at 17, para. 100).

"On November 8, 2022, [Council] was served with a final copy of the disciplinary charges and told he would have a reclassification hearing related to the disciplinaries the next day." (*Id.* at 18, para. 115). ADOC personnel conducting the hearing told Council "that they believed that the disciplinaries brought against him were falsified" and later recommended that Council be "transferred away from Limestone for his safety." (*Id.* at 19, paras. 117–18). Council was not transferred.[9] (*Id.* at 19, para. 119).

On November 28, 2022, while conducting another "shakedown" of Council's restrictive housing cell, Officer "Brewer and [Lieutenant] Jones assaulted [Council], threw him to the floor, cut his clothes off, and placed him on suicide watch." (Doc. 85 at 19, para. 120–21). At 3:00 a.m. on December 2, 2022, "Brewer conducted another shakedown of [Council]'s cell. . . . Brewer said that Limestone Correctional Sergeant Adkins had ordered the shakedown." (*Id.* at 19, para. 122). Council "asked that a supervisor observe the shakedown and . . . Brewer's interactions with [him]. In response, . . . Brewer sprayed [Council] in the face with pepper spray." (*Id.* at 19, para. 123). Adkins arrived; "he said that he had not directed . . . Brewer to search [Council]'s cell." (*Id.* at 20, para. 124). Brewer "attempted to write [Council] a disciplinary for these events, but . . . Adkins would not sign off." (*Id.* at 20, para. 125).

In April 2023, Council's attorney notified Commissioner Hamm that "Brewer had repeatedly harassed [Council] by conducting . . . shakedowns of his cell[,] . . . [and] had

---

[9] Generally, Coordinator Price, Coordinator Ellington, Warden Toney, Warden Crabtree, and Warden Streeter "received . . . reports and updates about the security conditions at Limestone and requests to transfer prisoners." (Doc. 85 at 12, para. 58).

twice used excessive force against [Council] during [those] shakedown[s]."[10] (*Id.* at 12, para. 57). Council was not returned to general population until May 2023. (Doc. 85 at 20, para. 126).

As Council returned to general population, threats against him allegedly grew. "In late May and early June 2023, . . . Pelzer told several prisoners that he wanted [Council] dead. . . . [Lieutenant] Pelzer told these prisoners that he would ensure they were not punished if they hurt or killed [him]. These prisoners told [Council] what . . . Pelzer had said, placing [Council] in further fear for his life." (*Id.* at 20, para. 128). On June 18, 2023, a video from Limestone was posted on social media; Council had no role in producing or posting the video. (*Id.* at 20, paras. 129–33). Thereafter, "Pelzer prohibited an entire housing unit from buying commissary items (referred to as 'catching store'), telling the [prisoners] that . . . 'Council posted a video, and that's why y'all can't catch store.'" (*Id.* at 20, para. 131 (alteration adopted)).

Despite these incidents, Council referred five prisoners who had suffered use of force by officers at Limestone between July and August of 2023 to an attorney. (*Id.* at 21–22, para. 140–41). This resulted in an "increasing number of attorney visits and legal phone calls being scheduled with those . . . prisoners." (*Id.* at 22, para. 142). Warden Streeter and Lieutenant Pelzer "became alarmed" and "began to fear that [Council] was orchestrating a legal campaign" that would affect them. (*Id.*).

---

[10] Generally, Commissioners "Dunn and Hamm . . . received . . . information about litigation involving . . . ADOC and ADOC officials." (Doc. 85 at 12, para. 58).

"On October 15, 2023, . . . [Warden] Streeter accused [Council] of uploading a[nother] video onto social media." (*Id.* at 22, para. 144). Though the video was from years earlier and was not filmed at Limestone, "Streeter told . . . [Officer] Parker to place [Council] in restrictive housing for unauthorized participation in social networking." (*Id.* at 22–23, paras. 145–47). Parker and Officer Brewer told Council "they were placing him in restrictive housing because he had violated ADOC's social media policy." (*Id.* at 23, para. 148). "Without immediately complying, [Council] asked, '[f]or what?' He . . . did not physically touch . . . Parker or Brewer, and did not actively or forcibly resist them." (*Id.* at 23, para. 149). "Nevertheless, . . . Parker sprayed [Council] in the face with SABRE Red Phantom Cell Buster pepper spray."[11] (Doc. 85 at 23, para. 150). This resulted in the burning of Council's face and left ear. (*Id.* at 23, para. 152). Council "was taken to the health care unit and the pepper spray was cleaned off him. [He] told . . . Parker and Brewer that the video had been taken years ago and discussed the facts indicating that it was not taken at Limestone." (*Id.* at 23, para. 154).

Officer Parker and Officer Brewer "charged [Council] with violating the ADOC's social media policy" as well as "assault." (*Id.* at 23–24, paras. 155–56). On October 30, 2023, a disciplinary hearing was held on the charges, and the ADOC presented no witnesses. (*Id.* at 24, paras. 157–58). Yet, before the hearing, "the disciplinary violation forms were . . . filled out with a finding against [Council]." (*Id.* at 24, para. 159).

---

[11] "SABRE Red Phantom Cell Buster pepper spray is an extremely powerful version of pepper spray that is used as a cell extraction tool and is designed to be sprayed into a cell, not onto a prisoner." (Doc. 85 at 23, para. 151).

"In September 2023, . . . [Warden] Crabtree instructed Classification Supervisor Kristen Obenchain to determine whether [Council] could be transferred out of Limestone." (*Id.* at 24, para. 161). "In October 2023, Correctional Captain McKenzie told [Council] that members of the Limestone security staff had been trying repeatedly to get him transferred" to no avail. (*Id.* at 24, para. 162). On November 6, 2023, Council's attorney "informed ADOC officials that [Council] had been the subject of retaliation by Limestone security staff and requested that [he] b[e] transferred from Limestone by 7:00 p.m. that day." (*Id.* at 24, para. 163). Council was not transferred. (*See id.* at 24, para. 164). Correctional Lieutenant Howell told Council that "ADOC . . . had intended to transfer [him]. After th[e] letter, however, the transfer requests were cancelled because the officials did not want to appear to be complying with an attorney's request." (*Id.* at 24–25, para. 164).

"In December 2023, a reclassification hearing was held based on the . . . disciplinaries from October 2023." (*Id.* at 25, para. 165). The officer who notified Council of the hearing and the supervisor conducting the hearing both told Council that they "knew that [Council] had not assaulted . . . [Officer] Parker." (*Id.* at 25, paras. 166–67). Nonetheless, the supervisor "recommended that [Council] be reclassified as close custody based on the disciplinaries." (*Id.* at 25, para. 168).

Council filed this case on December 18, 2023. (Doc. 1). After a lengthy procedural history, Council filed a third amended complaint (the operative complaint) on November 21, 2025. (Doc. 85). The Defendants filed their motion to dismiss shortly thereafter. (Doc. 87).

## V. DISCUSSION

Council brings a total of six claims: three federal claims and three state law claims. But it would be misleading to simply look at the headings and style of Council's third amended complaint because, in truth, Council brings numerous subclaims within each claim. For example, in his lone First Amendment retaliation claim, Council alleges multiple instances of retaliation by fifteen defendants, across several years, and under different theories of liability. (Doc. 85 at 25–27, paras. 169–72). Such a pleading does not comply with the spirit of the Federal Rules of Civil Procedure. Those rules require a complaint to contain a *short* and *plain* statement showing that the plaintiff is entitled to relief. FED. R. CIV. P. 8(a)(2). Allegations should be "simple, concise, and direct." *Id.* 8(d)(1). Each claim should be stated in separate, numbered paragraphs, "limited as far as practicable to a single set of circumstances." *Id.* 10(b). This precision requirement enables the opposing party to adequately respond to the claims against it and allows the Court to "determine which facts support which claims and whether the plaintiff has stated any claims upon which relief can be granted." *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1320 (11th Cir. 2015) (quoting *T.D.S. Inc. v. Shelby Mut. Ins. Co.*, 760 F.2d 1520, 1544 n.14 (11th Cir. 1985) (Tjoflat, J., dissenting)). Despite his imprecise pleadings, the Court can sufficiently ascertain Council's claims, and the Defendants could do the same in their motion and associated briefing.

The expansive nature of Council's claims contained in his thirty-four-page operative complaint is further exacerbated by a seventy-nine-page response to the Defendants' motion to dismiss. That response introduces new allegations and new theories, essentially

attempting to operate as a fourth amended complaint. The Court will not indulge this course of action. *See Iqbal*, 556 U.S. at 678 (stating that "a *complaint* must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" (quoting *Twombly*, 550 U.S. at 570) (emphasis added)). So, in ruling on the Defendants' motion to dismiss, the Court analyzes the factual pleadings contained in Council's third amended complaint.

**A. Threshold Issues**

As further table setting, the briefing on the Defendants' motion to dismiss presents several threshold issues. Some of those issues were not fully briefed. Namely, the Defendants cursorily argue "that [Council] has already attempted a retaliation claim against Limestone officials, including multiple defendants in the present lawsuit," and "[s]o any protected activity or alleged retaliation that was the subject of that lawsuit should be precluded under the doctrines of claim or issue preclusion." (Doc. 88 at 9–10). But, short of citing two cases generally discussing those doctrines, the Defendants provide no briefing or analysis as to why either should apply in this case, nor even to which defendants it should apply. (*See id.*). The Court agrees with Council that the Defendants have therefore abandoned this argument for purposes of their motion to dismiss. *See Peeples v. Carolina Container, LLC*, 2022 WL 4000350, at *3 (N.D. Ga. Sep. 1, 2022) ("Where a party does not 'support its arguments with sufficient detail'—including with 'citations to authority or significant discussion'—courts 'consider these arguments abandoned and do not consider

them.'" (alteration adopted) (quoting *Nat'l Mining Ass'n v. United Steel Workers*, 985 F.3d 1309, 1327 n.16 (11th Cir. 2021))).[12]

The Defendants briefed two other threshold issues: statute of limitations and standing as to Dunn. The Court starts with the Defendants' arguments regarding the statute of limitations. All of Council's claims are governed by a two-year statute of limitations. "A limitations period begins to run when a cause of action accrues." *Horsley v. University of Alabama*, 564 F. App'x 1006, 1008 (11th Cir. 2014) (citing *Rozar v. Mullis*, 85 F.3d 556, 561 (11th Cir. 1996)). In Alabama, the personal injury statute of limitations is set at two years. *See* ALA. CODE § 6-2-38(l). The residual personal injury statute of limitations applies to all actions brought under § 1983. *Owens v. Okure*, 488 U.S. 235, 249-50 (1989). This would apply to the tort of outrage or intentional infliction of emotional distress as well. *See Continental Cas. Ins. Co. v. McDonald*, 567 So. 2d 1208, 1215 (Ala. 1990) ("The statutory period of limitations for the tort of outrage is two years."). Council filed his initial complaint on December 18, 2023. (Doc. 1). Thus, any of Council's claims that accrued before December 17, 2021, are time-barred. As to this issue, the Defendants only specifically discussed Commissioner Dunn and the negligent retention or supervision claim (Count VI). (*See* doc. 88 at 5–7). Because these claims are due to be dismissed on other grounds discussed later in this Opinion, the Court pretermits further statute of limitations analysis.

---

[12] The Court here, and elsewhere in this Opinion, cites to nonbinding authority. While the Court recognizes that these cases are not precedential, the Court finds them persuasive.

Turning to the standing issue, Dunn left office as ADOC Commissioner in December 2021. (Doc. 85 at 5, para. 11). The Defendants argue this means that only claims that accrued against Dunn between December 17, 2021, and December 31, 2021, are viable. (Doc. 88 at 7–8). The Court assumes *arguendo* that all of Council's claims against Dunn satisfy this threshold issue because, as later discussed, Council fails to state a claim against Dunn and those claims are therefore due to be dismissed for an independent reason.

With those preliminary matters out of the way, the Court turns to the substance of Council's claims.

**B. Federal Claims**

The Defendants assert qualified immunity as a defense against the Council's federal claims: Counts I, II, and III. (Doc. 88 at 21–22). "Qualified immunity shields government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Carruth v. Bentley*, 942 F.3d 1047, 1053 (11th Cir. 2019) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "To invoke the defense of qualified immunity, a government official must have been acting within the scope of his 'discretionary authority' when the allegedly wrongful acts occurred." *Spencer v. Benison*, 5 F.4th 1222, 1230 (11th Cir. 2021). "After a government official establishes that he was acting within the scope of his discretionary authority, the burden shifts to the plaintiff to show that the official's conduct (1) violated federal law (2) that was clearly established at the relevant time." *Id.*; *accord Carruth*, 942 F.3d at 1054 ("If the official makes this showing [of discretionary authority], 'the burden shifts to the plaintiff to show that qualified immunity is not

appropriate.'" (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002))). Once the burden shifts, the Court may address the two prongs in any order. *Pearson*, 555 U.S. at 236 (explaining that courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first"). Further, if a plaintiff fails to satisfy the first-discussed prong, then courts may conserve judicial resources by pretermitting further qualified immunity analysis. *See id.*

"A right may be clearly established for qualified immunity purposes in one of three ways: (1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Gilmore v. Ga. Dep't of Corr.*, 144 F.4th 1246, 1258 (11th Cir. 2025) (en banc). Courts are instructed "not [to] define clearly established law at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).

Council does not dispute that the Defendants were acting within the scope of their discretionary authority for purposes of his federal claims against them.[13] (*See* doc. 91). As such, the burden shifts to Council to show that qualified immunity is not appropriate. The Defendants argue that Council fails to state a claim on any of his federal claims, meaning he "has also failed to allege a violation of a constitutional right." (Doc. 88 at 22). Accordingly, at this early stage, the Defendants' assertion of qualified immunity largely

[13] With one exception: Council argues that Lieutenant Pelzer was not "acting within his discretionary authority when [he] attempt[ed] to have other prisoners murder [Council]." (Doc. 91 at 54). The Court takes up that argument when discussing Count II.

rises or falls on whether Council sufficiently states his federal claims.[14] Because Council bears the burden to show that qualified immunity is inappropriate as to each defendant, the Court discusses below whether Council has carried that burden as to each of his federal claims—Counts I through III—in turn.

### 1. First Amendment Retaliation: Count I

Council brings a First Amendment retaliation claim against fifteen defendants.[15] "The gist of a retaliation claim is that a prisoner is penalized for exercising the right of free speech." *Thomas v. Evans*, 880 F.2d 1235, 1242 (11th Cir. 1989). To prevail, Council must establish three elements: (1) "his speech was constitutionally protected," (2) he "suffered adverse action such that the [Defendants'] allegedly retaliatory conduct would likely deter a person of ordinary firmness from engaging in such speech," and (3) "there is a causal relationship between the retaliatory action and the protected speech." *Smith v. Mosley*, 532 F.3d 1270, 1276 (11th Cir. 2008). But "an inmate's First Amendment right to free speech is not protected if affording protection would be inconsistent with the inmate's 'status as a prisoner or with the legitimate penological objectives of the corrections system.'" *Id.* at 1277 (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974)).

[14] The Defendants do not meaningfully address in their initial brief whether any allegedly violated right was clearly established at the time of the conduct. (*See* doc. 88 at 22). Instead, the "Defendants reserve[d] any remaining argument for reply." (*Id.*). However, the Defendants' reply brief contained no meaningful discussion of this issue. (*See* doc. 95). Nonetheless, it is Council's burden to show that the allegedly violated right was clearly established.

[15] As noted above, the Court's Opinion does not address Council's First Amendment retaliation claim against Officer Dozier. *See supra* Section I; *see also supra* n.1 (dismissing Officer Dozier without prejudice from this action for failure to prosecute).

Because First Amendment retaliation suits turn on the subjective intent of the government actor, they are "easy to allege and hard to disprove." *DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1289 (11th Cir. 2019) (quoting *Nieves v. Bartlett*, 587 U.S. 391, 403 (2019)). Accordingly, the causation requirement is strictly enforced, and a plaintiff raising a retaliation claim must plausibly allege "that the government took an 'adverse action' in response to his speech that 'would not have been taken absent the retaliatory motive.'" *Hou. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 477 (2022) (quoting *Nieves*, 587 U.S. at 398–99). Circumstantial evidence, such as temporal proximity between the adverse action and the protected activity, can be used to show causation. *See Indigo Room, Inc. v. City of Fort Myers*, 589 F. App'x 938, 947 (11th Cir. 2014) (per curiam).

At the outset, the Court notes that Count I is difficult to parse given Council's reliance on innumerable actions he claims all constitute protected activity. In his complaint, Council alleges that the Defendants all retaliated against him, in one way or another, "for filing lawsuits, assisting other prisoners in filing lawsuits, and speaking out against unlawful practices with[in] the ADOC." (Doc. 85 at 26, para. 171). And in his response in opposition to the Defendants' motion to dismiss, Council suggests that any adverse actions taken against him are necessarily due to his "general reputation as an activist engaged in First Amendment activities." (*See* doc. 91 at 46; *accord id.* at 37–38). Such general allegations obfuscate Council's claims and therefore do not help him—the Court will not untangle Council's allegations for him. *See Smith v. Sec'y, Dep't of Corr.*, 572 F.3d 1327, 1352 (11th Cir. 2009) ("Judges are not like pigs, hunting for truffles buried in briefs.") (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)).

The Court discusses Council's First Amendment retaliation claim against each defendant in turn, beginning with the supervisory Defendants and warden Defendants.

**a. Supervisory and Warden Defendants**

Supervisors "are not liable under [42 U.S.C.] § 1983 for the unconstitutional acts of their subordinates 'on the basis of respondeat superior or vicarious liability.'" *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999) (quoting *Belcher v. City of Foley*, 30 F.3d 1390, 1396 (11th Cir. 1994)). Instead, supervisors are liable under § 1983 "either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional violation." *Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010) (quotations omitted).

**i. Dunn, Hamm, Ellington, Toney, and Crabtree**

Council alleges that Commissioner Dunn, Commissioner Hamm, Coordinator Ellington, Warden Toney, and Warden Crabtree personally retaliated against him when they failed to transfer him from Limestone, "subject[ing] him to continued violence and threats." (Doc. 85 at 26, para. 171(b)). One glaring problem with Council's claim against these defendants is that he does not sufficiently allege that any of them *personally* refused to transfer him from Limestone.[16] Instead, Council's complaint either states an allegation

[16] The most specific allegation by Council is that "[i]n September 2023, . . . [Warden] Crabtree instructed Classification Supervisor Kristen Obenchain to determine whether [Council] could be transferred out of Limestone." (Doc. 85 at 24, para. 161). This allegation appears to undercut Council's claim, however, because it would be illogical for Crabtree to initiate a transfer evaluation in September 2023 if, as Council alleges, Crabtree had retaliatory animus connected to Council's protected activity dating back to 2019.

in conclusory fashion or alleges specific actions taken by unnamed "ADOC officials." (*See, e.g.*, doc. 85 at 24–25, paras. 163–64 (alleging that Council's attorney sent a letter to unnamed "ADOC officials" requesting a transfer due to retaliation and, subsequently, previously planned "transfer arrangements were cancelled because the officials did not want to appear to be complying with an attorney's request")).

Even if Council sufficiently alleged the individual(s) responsible for keeping Council at Limestone, Council does not allege a plausible causal connection between that act and his protected activity. Boiled down, Council's causation argument is that these defendants had no objective reason to leave him in Limestone, so it *must have* been because of his various First Amendment activities over the preceding years. (*See id.* 85 at 25, para. 170 ("Defendants' refusal to transfer [Council] out of Limestone and away from Defendant Pelzer can only be explained by retaliatory animus or [as an] attempt to prevent [Council] from further exposing their wrongdoing."); doc. 91 at 46 ("Because there was no legitimate reason to keep [Council] at Limestone where he faced numerous documented threats, the obvious explanation is retaliatory animus against [Council] for his political association with FAM and his critiques of the ADOC.")). This is speculative at best, especially given the litany of reasons that ADOC transfers inmates. And such speculation does not satisfy the causation requirement. *See Jemison v. Wise*, 386 F. App'x 961, 965 ("In other words, the prisoner must show that, as a subjective matter, a motivation for the defendant's adverse action was the prisoner's grievance or lawsuit.") (per curiam) (citing *Smith v. Mosley*, 532

F.3d 1270, 1278 (11th Cir. 2008)).[17] To conclude otherwise would render prison officials susceptible to liability for taking any adverse action against an inmate who previously alleged wrongdoing, regardless of circumstances.

Because Council's retaliation claims against the foregoing defendants are insufficiently pled and do not satisfy the causation element, they are due to be dismissed for failure to state a claim and qualified immunity thus applies since Council fails to allege a violation of federal law. *Cf. Brown v. Mache*, 233 F. App'x 940, 941 (11th Cir. 2007) (per curiam) ("Although Brown did engage in protected conduct by filing his grievances, Brown provides no facts indicating that [his subsequent] reassignment was retaliatory. His claims are conclusory in that they fail to allege any causal link between his grievances and the defendants' decision regarding his work schedule.").

**ii. Price**

Council alleges that Coordinator Price retaliated against him by ordering his transfer to Limestone in December 2021. (Doc. 85 at 26, paras. 171(a) & (b)). For similar reasons stated above, Council fails to state a retaliation claim against Price because he does not allege a plausible causal connection between his protected activity and Price's order to transfer Council to Limestone. Council merely alleges retaliatory animus and a causal connection in conclusory fashion. The retaliation claim against Price is thus due to be

---

[17] Council also argues that the "fabricated enemy conflict" with Melvin Ray is obviously false and therefore evidence of these defendants' retaliatory animus. (Doc. 91 at 47). But there is no allegation that Commissioner Dunn, Commissioner Hamm, Coordinator Ellington, Warden Toney, or Warden Crabtree participated in "fabricating" this designation or have asserted it as a justification for refusing to transfer Council from Limestone. (*See* doc. 85 at 9–10, para. 38 (noting that this designation was made by unnamed "ADOC officials")).

dismissed for failure to state a claim, and qualified immunity applies since Council fails to allege a violation of federal law.

**iii. Streeter**

Council alleges that, in retaliation for engaging in protected activity, Warden Streeter: (1) failed to transfer Council away from Limestone despite "the danger [Council] faces at Limestone"; (2) "approved [Council]'s placement in restrictive housing on December 17, 2021"; (3) "approved a recommended finding of guilt on a voided disciplinary [form] on January 31, 2022"; (4) "approved a recommended finding of guilt on a disciplinary he knew was fabricated"; and (5) "ordered [Council] to be taken to restrictive housing on October 15, 2023." (*Id.* at 26, paras. 171(b) & (c)).

Council does not allege a plausible causal connection between his protected activity and these alleged adverse actions taken by Warden Streeter.[18] Instead, like the previously discussed defendants, Council generally alleges that Streeter *must have* taken this action in retaliation for Council's litany of protected activity. (*See, e.g.*, doc. 91 at 39 ("Defendants' lack of any legitimate reason for placing [Council] in restrictive housing and the surrounding circumstances support the inference that one motivating factor for his placement in restrictive housing was retaliation for his reputation of activism against the ADOC.")). This is more than an inference; it is a logical leap stated in conclusory fashion.

[18] To the extent that Council argues any of Warden Streeter's actions were connected to the September 2022 prison work strikes, that activity does not appear to be protected under the First Amendment. *See Council v. Ivey*, 771 F. Supp. 3d 1208, 1235 (M.D. Ala. 2025) ("[C]aselaw on inmate labor union activity and work stoppages suggests that ADOC's prohibitions on the refusal to work and encouraging others to stop working are legitimate.").

Council thus fails to state a retaliation claim against Streeter, qualified immunity applies since Council fails to allege a violation of federal law, and the claim is due to be dismissed.

**b. Correctional Officer Defendants**

The Court now turns to the correctional officer defendants.

**i. Caldwell**

Council alleges that Lieutenant Caldwell approved his placement in restrictive housing because she, along with other "members of the Limestone administration, . . . had jointly decided they did not want [Council] placed in general population." (Doc. 85 at 13–14, para. 68; *id.* at 26, para. 171(d)). Council also alleges that in January 2021, Caldwell told his mother that unnamed "ADOC officials in Montgomery had directed that [Council] be placed in restrictive housing for speaking to a journalist." (*Id.* at 15, para. 82).

Placement in restrictive housing—"functionally solitary confinement," (*id.* at 10, para. 44)—is certainly adverse. *See Williams v. Radford*, 64 F.4th 1185, 1193 (11th Cir. 2023) ("[P]lacing an inmate in disciplinary/segregated confinement constitutes an adverse action for purposes of a First Amendment retaliation claim."). However, (1) there could be a wide variety of permissible reasons for officials to not want Council in the general population of Limestone, and Council does not sufficiently allege what Caldwell's motivation or reasoning was for that decision; and (2) Lieutenant Caldwell did not say that *she* placed Council in restrictive housing for speaking to a journalist. In other words, Council does not sufficiently allege a causal relationship between his protected activity and any adverse action taken by Caldwell. Council therefore fails to state a retaliation claim

against Caldwell, qualified immunity applies because Council fails to allege a violation of federal law, and the claim is due to be dismissed.

**ii. Brewer**

Council alleges that Officer Brewer assaulted him on November 28, 2022, and December 2, 2022, in retaliation for his protected activities. (Doc. 85 at 27, para. 171(j)). Once again, Council does not directly connect these alleged assaults with a specific protected activity, failing to plausibly allege a causal connection.[19] As such, Council fails to state a retaliation claim against Brewer, qualified immunity applies because Council fails to allege a violation of federal law, and the claim is due to be dismissed.

**iii. Bright**

Council alleges that Officer Bright "placed [him] in an uncleaned restrictive housing cell covered in pepper spray and denied [him] access to cleaning materials" in retaliation for his protected activity. (Doc. 85 at 27, para. 171(f)). However, Council does not plausibly allege a causal connection between these alleged actions and protected activity. Thus, Council fails to state a retaliation claim against Bright, qualified immunity applies because Council fails to allege a violation of federal law, and the claim is due to be dismissed.

---

[19] As to the December 2, 2022 incident, Council alleges that Officer Brewer conducted a shakedown of his cell. (Doc. 85 at 19, para. 122). According to Council, he "asked that a supervisor observe the shakedown and . . . Brewer's interactions with [Council]." (*Id.* at 19, para. 123). Following his request, Brewer sprayed Council "in the face with pepper spray." (*Id.*). In his response, Council did not argue that his request for a supervisor constituted protected speech. This comports with Council's allegation that the protected activity in relation to Brewer was, generally, "filing lawsuits, assisting other prisoners in filing lawsuits, and speaking out against unlawful practices with the ADOC." (*Id.* at 26, para. 171). The December 2, 2022 incident is the subject of later discussed excessive force and assault and battery claims.

**iv. Charley**

Council alleges that Officer Charley retaliated against him when Charley conducted a "pretextual" search of his cell on December 20, 2021, and "threatened [Council] with losing another eye" a year and a half later on June 20, 2023. (*Id.* at 14, para. 69; *id.* at 21, para. 134; *id.* at 27, para. 171(i)). But calling Charley's search pretextual does not make it so, and the fact that Council was not ultimately punished for the contraband found during the search does not render the search retaliatory. If anything, the fact that Council was not punished undermines his argument that the search was retaliatory. And even if Charley's subsequent threat regarding Council's eye did demonstrate a retaliatory animus, that statement was made more than a year after the search. To the extent Council believes that this statement was connected to his April 2023 grievance, that grievance is not alleged to have referenced Charley, nor is it alleged that Charley knew of that grievance. Thus, Council fails to state a retaliation claim against Charley, qualified immunity applies because Council fails to allege a violation of federal law, and the claim is due to be dismissed.

**v. Whitfield**

Council alleges that Lieutenant Whitfield retaliated against him when Whitfield "act[ed] as a hearing officer[ and] found [Council] guilty on a voided disciplinary charge." (*Id.* at 27, para. 171(g)). But Council does not allege a causal connection between his protected activity and this action. Moreover, there is no plausible allegation that Whitfield's decision as a hearing officer was unlawfully motivated.

Though Council argues in his response that Lieutenant "Whitfield . . . operated under the policy that '[he] did not want' [Council] in general population," (doc. 91 at 40 (quoting doc. 85 at 13–14, para. 68)), that assertion misstates the third amended complaint, which does not allege that Whitfield was among those who wanted to keep Council out of general population, (*see* doc. 85 at 13–14, para. 68 ("[M]embers of the Limestone administration, including Defendants Toney, Streeter, and Caldwell[] . . . had jointly decided they did not want Plaintiff placed in general population.")). And even if Whitfield wanted to keep Council out of general population, it is unclear how that bare fact means Whitfield's decision was infected with retaliatory animus.

Council therefore fails to state a retaliation claim against Lieutenant Whitfield, qualified immunity applies because Council fails to allege a violation of federal law, and the claim is due to be dismissed.

**vi. Jones**

Council alleges two discrete retaliatory actions by Lieutenant Jones. First, Jones "served as [a] hearing officer" at a disciplinary hearing, finding Council guilty of the charged infraction despite alleged procedural irregularities. (*Id.* at 17–18, paras. 103–08; *id.* at 26–27, para. 171). Second, Jones allegedly "assaulted [Council] on November 28, 2022." (*Id.* at 27, para. 171(k)).

Council again does not allege a causal connection between his protected activity and these actions. Regarding the hearing, there is no plausible allegation that Lieutenant Jones' decision as a hearing officer was unlawfully motivated. As for Jones' alleged assault, Council argues that it must have been "in retaliation for [his] general reputation as an

activist and a founder of FAM" because there was no "legitimate reason" for it. (Doc. 91 at 37). But again, causation in this context turns on subjective intent, which Council has failed to allege. *See Jemison*, 386 F. App'x at 965; *Brown v. Adams*, 2024 WL 1600280, at *3 (S.D. Ga. Feb. 22, 2024) (recommending the dismissal of the plaintiff's retaliation claim where the causation element was premised only on the plaintiff's "history of filing lawsuits"), *report and recommendation adopted by sub nom.*, *Brown v. Sharpe*, 2024 WL 1254804 (S.D. Ga. Mar. 25, 2024).

Council therefore fails to state a retaliation claim against Lieutenant Jones, qualified immunity applies because Council fails to allege a violation of federal law, and the claim is due to be dismissed.

**vii. Gilbert**

Council alleges that Officer Gilbert retaliated against him by making "threats to kill or assault prisoners to and about [Council]." (Doc. 85 at 27, para. 171(l)). Council specifically alleges that "another prisoner told [him] that he heard Defendant Gilbert refer to [Council] while gritting his teeth and saying, 'I can't wait to catch his ass. Everybody be following him like he somebody.'" (*Id.* at 21, para. 139). That allegation may plausibly allege a causal connection, but it does not constitute an adverse action unto itself.

Council also alleges that Officer Gilbert refused to stop a fellow correctional officer from using excessive force on an inmate after Council brought it to his attention, stating: "Fuck that shit. I'm gone start sending their ass out the back gate." (*Id.* at 21, paras. 135–38; *id.* at 27, para. 171(l)). This does not support Council's retaliation claim because

Gilbert's alleged statement was directed at another inmate, meaning Council did not personally suffer an adverse action.

Therefore, Council fails to state a retaliation claim against Officer Gilbert, qualified immunity applies because Council fails to allege a violation of federal law, and the claim is due to be dismissed.

**viii. Pelzer**

Council alleges that, in retaliation for his protected activities, Lieutenant Pelzer (1) "threatened and attempted to have [him] killed or injured"; and (2) "fabricated disciplinaries about the September 28, 2022[] incident" at which Council says that Pelzer was not present. (*Id.* at 18, paras. 109–11; *id.* at 27, para. 171(e)). If proven, these allegations constitute adverse actions.

Council's allegations also draw a causal connection between Lieutenant Pelzer's alleged adverse actions and Council's protected activity. To start, Council and Pelzer have a history. In July 2019, Council helped another inmate bring an excessive force claim against Pelzer.[20] (Doc. 85 at 11, para. 49). A few months later, Council exposed an illegal gambling operation Pelzer was running at Limestone. (*Id.* at 11, para. 50). Soon after, Council heard from another inmate that Pelzer believed Council's "activism . . . might cause . . . Pelzer to lose his job and that . . . Pelzer intended to violently retaliate against

[20] Generally, "[p]risoners do not have a First Amendment right to provide legal assistance to fellow prisoners." *Taylor v. McSwain*, 335 F. App'x 32, 33-34 (11th Cir. 2009) (per curiam) (citing *Shaw v. Murphy*, 532 U.S. 223, 225-32 (2001)). "However, where a prisoner undertakes litigation on behalf of others in order to bring about social change and protect constitutional rights, his actions may be considered protected political expression." *Id.* (citing *Adams v. James*, 784 F.2d 1077, 1081 (11th Cir. 1986)).

[Council]." (*Id.* at 11, para. 52). But this was not isolated to 2019 (outside the statute of limitations). Council alleges that, after he returned to Limestone, "[i]n late May or early June 2023," Pelzer told several other inmates "that he wanted [Council] dead" and promised protection "if they hurt or killed" Council. (*Id.* at 20, para. 128). Council further alleges that, around the same time, Pelzer manufactured an excuse to prevent "an entire housing unit" within Limestone from purchasing items from the prison commissary and told the inmates that Council was to blame—"plac[ing] a target on [Council]." (*Id.* at 20, paras. 131–32).

These allegations satisfy Council's burden to plausibly allege a causal connection between his protected activity and Lieutenant Pelzer's actions. Council therefore states a retaliation claim against Pelzer. And qualified immunity does not shield Pelzer from that claim at this early stage of the proceedings because offering inmates protection to seriously harm or kill another inmate in retaliation for protected activity constitutes "conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Gilmore*, 144 F.4th at 1258.

**2. Eighth Amendment Deliberate Indifference: Count II**

Council brings an Eighth Amendment deliberate indifference claim against eight defendants. (Doc. 85 at 27–28, paras. 173–76). The Eighth Amendment prohibits the infliction of cruel and unusual punishments. U.S. CONST. amend. VIII. Because inmates are deprived of liberty and the ability to provide for themselves, the Eighth Amendment imposes an affirmative duty upon the state to ensure prisoners are "furnished with the basic human needs, one of which is 'reasonable safety'" from themselves and others. *See Helling*

*v. McKinney*, 509 U.S. 25, 33 (1993) (quoting *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989)); *see also Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014) ("The Eighth Amendment 'imposes a duty on prison officials' to 'take reasonable measures to guarantee the safety of the inmates.'" (alterations adopted) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994))); *Youngberg v. Romeo*, 457 U.S. 307, 315–16 (1982) ("[I]t is cruel and unusual punishment to hold convicted criminals in unsafe conditions . . . ."). An obvious danger against which prison officials must guarantee safety by reasonable measures is attack by other incarcerated individuals. *Est. of Owens v. GEO Grp., Inc.*, 660 F. App'x 763, 767 (11th Cir. 2016) (per curiam) ("[I]t has long been recognized that 'prison officials have a duty to protect prisoners from violence at the hands of other prisoners.'" (quoting *Farmer*, 511 U.S. at 833)).

To succeed on a claim of deliberate indifference, a plaintiff must satisfy a two-part test:

> 1. *First* . . . the plaintiff must demonstrate, as a threshold matter, that he suffered a deprivation that was, "objectively, 'sufficiently serious.'"
>
> 2. *Second*, the plaintiff must demonstrate that the defendant acted with "subjective recklessness as used in the criminal law," and to do so he must show that the defendant was actually, subjectively aware that his own conduct caused a substantial risk of serious harm to the plaintiff—with the caveat . . . that even if the defendant "actually knew of a substantial risk to inmate health or safety," he "cannot be found liable under the Cruel and Unusual Punishments Clause" if he "responded reasonably to the risk."

*Wade v. McDade*, 106 F.4th 1251, 1262 (11th Cir. 2024) (en banc) (internal citations omitted) (quoting *Farmer*, 511 U.S. at 834, 839, 844–45). A plaintiff must also produce

sufficient evidence of "causation between that indifference and the plaintiff's injury." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1307 (11th Cir. 2009) (citing *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1326 (11th Cir. 2007)). Accordingly, the plaintiff must satisfy (1) the objective inquiry, (2) the subjective inquiry, and (3) causation.

To satisfy the objective inquiry, a plaintiff must show a condition "so extreme that it poses an unreasonable risk of serious damage to the prisoner's health or safety." *Richardson v. Johnson*, 598 F.3d 734, 737 (11th Cir. 2010) (per curiam). And to satisfy the subjective inquiry, a plaintiff must show that the defendant: "(1) had subjective knowledge of a risk of serious harm, (2) disregarded that risk, and (3) engaged in conduct that amounts to subjective recklessness." *Stalley v. Cumbie*, 124 F.4th 1273, 1283 (11th Cir. 2024) (citing *Farmer*, 511 U.S. at 836–40). To demonstrate subjective knowledge of a risk of serious harm, it is not enough to show that a defendant "*should have known*" of a substantial risk of serious harm—it must be shown the defendant "*actually knew* of a substantial risk of serious harm." *See Wade*, 106 F.4th at 1257 (emphases in original). Further, subjective recklessness is demonstrated "only if the plaintiff shows 'that the defendant actually knew that his conduct—*his own acts or omissions*—put the plaintiff at substantial risk of serious harm.'" *Stalley*, 124 F.4th at 1283–84 (emphasis added) (quoting *Wade*, 106 F.4th at 1253). Even so, "a defendant who 'respond[s] reasonably' to a risk, . . . even a known risk, 'cannot be found liable' under the Eighth Amendment." *Wade*, 106 F.4th at 1255 (alteration in original) (quoting *Farmer*, 511 U.S. at 837, 844)).

The Court discusses Council's deliberate indifference claim against each defendant in turn, beginning with the supervisory and warden defendants.

**a. Dunn, Hamm, Price, Ellington, Toney, Streeter, and Crabtree**

Council alleges that Commissioner Dunn, Commissioner Hamm, Coordinator Price, Coordinator Ellington, Warden Toney, Warden Streeter, and Warden Crabtree were deliberately indifferent to Council's "life-threatening conditions of confinement at Limestone from December 17, 2021, onwards, that exposed [Council] to (a) assaults by officers and terrorizing cell entries, and (b) threats to kill [Council] or attempts to incentivize other prisoners to kill him." (Doc. 85 at 27–28, para. 173 (citations omitted)). Further, that these defendants "have been on notice of these assaults, intimidation, threats, and attempts to kill [Council]." (*Id.* at 28, para. 174). And that these defendants "each failed to take any corrective measures within their authority to protect [Council], including failing to transfer him away from Limestone and failing to discipline, terminate, or initiate the arrest of Defendant Pelzer or any of the officers who have assaulted, threatened, and attempted to murder [Council]." (*Id.* at 28, para. 175).

One threshold problem for Council is that he points to allegations predating December 17, 2021. *See supra* Section V.A. For instance, he notes: "In January 2020, [Council], through counsel, informed Defendant Price of the retaliation he was experiencing and requested that Defendant Price ensure he was transferred from Limestone." (Doc. 85 at 11, para. 53). To circumvent this problem, Council connects this allegation with the later allegation that Price ordered his December 17, 2021 transfer to Limestone. (*Id.* at 26, para. 171(a); *id.* at 12, para. 59). That maneuver glosses over the facts that Council had left Limestone in the interim and nearly two years had elapsed between those two allegations.

Another problem for Council is that his allegations against these defendants boil down to that they "knew or must have known that Limestone was a uniquely dangerous facility for [Council]" because he submitted complaints and filed lawsuits. (*Id.* at 12, para. 58). This alone does not satisfy the demanding standard for an Eighth Amendment deliberate indifference claim because Council must allege sufficient facts to show that these defendants "*actually knew* of a substantial risk of serious harm." *Wade*, 106 F.4th at 1257 (emphasis in original). And that risk must be posed by their own conduct, "rather than more vaguely on some allegedly preexisting risk." *Id.* at 1261.

To that end, such a substantial risk of serious harm must be a specifically identified risk, not a generalized risk of harm.[21] *See Wade*, 106 F.4th at 1259 (observing that the Supreme Court's "focus" in *Farmer*, "was on whether the official knew that his own conduct—again, his own acts or omissions—put the inmate at risk, not just whether the inmate confronted a risk in the abstract."). Here, the "risk" that Council identifies is a parade of speculative harms that flow from being at Limestone, the ADOC's largest prison. Moreover, Council's third amended complaint implicitly assumes that his confinement at Limestone under virtually *any* circumstance would present conditions "so extreme" that they pose "an unreasonable risk of serious damage to . . . [his] health or safety."

[21] The Court notes, however, that a plaintiff can show a substantial risk of harm based on a "generalized risk of violence." To make such a showing, "a plaintiff must meet a high bar" by demonstrating that "such violence is 'the norm or something close to it,' such as 'confinement in a prison where violence and terror reign.'" *Marbury v. Warden III*, 180 F.4th 1349, 1356 (11th Cir. 2026) (quoting *Marbury v. Warden*, 936 F.3d 1227, 1234 (11th Cir. 2019) (per curiam) [hereinafter *Marbury I*]). "Neither 'a generalized awareness of risk' nor the mere presence of 'occasional, isolated attacks by one prisoner on another' will suffice." *Id.* (quoting *Marbury I*, 936 F.3d at 1234 (alterations adopted)). So, even if Council's claim was framed in this manner, his allegations certainly do not meet this high bar.

*Richardson*, 598 F.3d at 737. The Court will not assume such a sweeping, unwarranted fact to be true. *See Aldana*, 416 F.3d at 1248 (stating that "unwarranted deductions of fact" in a complaint "are not admitted as true" for the purpose of testing the sufficiency of a plaintiff's allegations); *see also Iqbal*, 556 U.S. at 681 (stating conclusory allegations are "not entitled to be assumed true").

For these reasons, Council fails to state a deliberate indifference claim against these defendants and qualified immunity thus applies because he fails to allege a violation of federal law.

**b. Pelzer**

Council alleges that he faced a substantial risk of serious harm that he would be assaulted or killed by either Limestone prison staff or other inmates acting at the behest of Lieutenant Pelzer. (Doc. 85 at 20–21, paras. 127–133; *id.* at 27–29, paras. 173–76). Specifically, that: (1) "[i]n late May and early June 2023, Defendant Pelzer told several prisoners that he wanted [Council] dead. Defendant Pelzer told these prisoners that he would ensure they were not punished if they hurt or killed [Council]," (*id.* at 20, para. 128); and (2) Pelzer put a "target" on Council when he "prohibited an entire housing unit from buying commissary items (referred to as 'catching store'), telling them that 'Robert Council posted a [video], and that's why y'all can't catch store,'" (*id.* at 20, paras. 131–32) (fourth alteration in original).

The Defendants argue that "there has never been any violent action, whether justified or unjustified, regarding Lt. Pelzer and [Council], and further, no evidence of a direct threat or threatening interaction between the two." (Doc. 88 at 14). Even if true,

those assertions do not foreclose liability for Pelzer. Indeed, the core allegation is that Pelzer *created* a direct risk to Council by encouraging other inmates to attack Council and it "has long been recognized that 'prison officials have a duty to protect prisoners from violence at the hands of other prisoners.'" *Est. of Owens*, 660 F. App'x at 767 (quoting *Farmer*, 511 U.S. at 833); *see Caldwell*, 748 F.3d at 1102 (noting that the Eleventh Circuit had "already clarified that a prison guard violates a prisoner's Eighth Amendment right when that guard actually (objectively and subjectively) knows that one prisoner poses a substantial risk of serious harm to another, yet fails to take any action to investigate, mitigate, or monitor that substantial risk of serious harm"). Given that, Pelzer encouraging other inmates to harm or kill Council would clearly contravene his duty to protect Council from inmate-on-inmate violence. Likewise, Pelzer's alleged actions constitute "conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Gilmore*, 144 F.4th at 1258. Council thus sufficiently alleges a deliberate indifference claim against Pelzer and at this early stage of the litigation, qualified immunity does not shield Pelzer from this deliberate indifference claim.[22]

---

[22] Council argues that Lieutenant Pelzer was not "acting within his discretionary authority when [he] attempt[ed] to have other prisoners murder [Council]." (Doc. 91 at 54). The parties did not meaningfully brief this issue. The Court therefore does not address this argument and assumes *arguendo* that Pelzer was acting within his discretionary authority since Council sufficiently states a claim and qualified immunity does not apply at this stage.

**3. Eighth Amendment Excessive Force: Count III[23]**

Council brings an Eighth Amendment excessive force claim against four defendants—Officer Collins, Officer Simpson, Officer Brewer, and Lieutenant Jones. The Eighth Amendment's prohibition on cruel and unusual punishment protects prisoners "against excessive force after conviction." *Piazza v. Jefferson Cnty.*, 923 F.3d 947, 952 (11th Cir. 2019). In a case like this, where a prisoner alleges that correctional officers used excessive force against him, the "core judicial inquiry" focuses "not [on] whether a certain quantum of injury was sustained, but rather 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (per curiam) (quoting *Hudson v. McMillian*, 503 U.S. 1, 7 (1992)).

Put simply, successful Eighth Amendment excessive-force claims must satisfy two different components—one subjective and another objective. *See Scott v. Dunn*, 794 F. Supp. 3d. 1119, 1131 (M.D. Ala. 2023). First, subjectively, the prison official must have "acted with a sufficiently culpable state of mind." *Sconiers v. Lockhart*, 946 F.3d 1256, 1265 (11th Cir. 2020) (quoting *Hudson*, 503 U.S. at 8). Specifically, the prison official's purported "excessive force must have been sadistically and maliciously applied for the very purpose of causing harm." *Id.* (quoting *Johnson v. Breeden*, 280 F.3d 1308, 1321 (11th Cir. 2002)). Second, objectively, the prison official's actions must have been "'harmful enough'

[23] The Defendants do not address Council's Eighth Amendment excessive force claim in their reply in support of the motion to dismiss. (*See generally* doc. 95).

. . . or 'sufficiently serious,' . . . to violate the Constitution." *Id.* (first quoting *Hudson*, 503 U.S. at 8; then quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).

Courts consider five factors to determine whether force was used maliciously and sadistically:

> (1) "the need for the application of force"; (2) "the relationship between the need and the amount of force that was used'; (3) "the extent of the injury inflicted upon the prisoner"; (4) "the extent of the threat to the safety of staff and inmates"; and (5) "any efforts made to temper the severity of a forceful response."

*Sears v. Roberts*, 922 F.3d 1199, 1205 (11th Cir. 2019) (quoting *Cockrell v. Sparks*, 510 F.3d 1307, 1311 (11th Cir. 2007)). "[N]ot 'every malevolent touch by a prison guard gives rise to a federal cause of action.'" *Wilkins*, 559 U.S. at 37 (quoting *Hudson*, 503 U.S. at 9). Rather, the Eighth Amendment forbids "force that offends 'contemporary standards of decency.'" *Sconiers*, 946 F.3d at 1266 (quoting *Wilkins*, 559 U.S. at 37). "Under the objective component of an Eighth Amendment claim, the force used, not the injury sustained, is what 'ultimately counts.'" *Id.* at 1267 (quoting *Wilkins*, 559 U.S. at 38). "Lastly, the 'use of force must stop when the need for it to maintain or restore discipline no longer exists.'" *Muhammad v. Sec'y, Fla. Dep't of Corr.*, 2026 WL 1895930 at *7 (11th Cir. July 1, 2026) (quoting *Skrtich v. Thornton*, 280 F.3d 1295, 1304 (11th Cir. 2002)).

With that legal framework in mind, the Court proceeds to analyze Council's excessive force claims in chronological order, beginning with his claim against Officer Collins and Officer Simpson.

**a. Collins and Simpson**

On September 28, 2022, Limestone officials "sent a group of prisoners to negotiate" with Council to end a strike to improve prison conditions. (Doc. 85 at 16, paras. 88–90). According to Council, after he "declined to oppose the strike, several Limestone correctional officers and members of the ADOC's Correctional Emergency Response Team . . . conducted a shakedown of [Council]'s cell." (*Id.* at 16, paras. 93–94). Council informed the officers "that he had no contraband and submitted to a strip search." (*Id.* at 16, para. 94). "During the search, [Council] was told he would be moved to restrictive housing." (*Id.* at 16, para. 95). Council "objected, stat[ing] that he had broken no ADOC rule, and asked to speak with a supervisor." (*Id.* at 16, para. 96).

After Council's request to speak with a supervisor, Officer Collins and Officer Simpson purportedly "grabbed [Council]'s wrist, twisted [Council]'s arm behind his back, and placed him in handcuffs." (*Id.* at 16–17, para. 96). Then, Collins and Simpson dragged Council "by an arm and a leg across the dorm, placed [him] on top of a trash cart, and wheeled [Council] to the health care unit for a body chart." (*Id.* at 17, para. 96). Council alleges that he "did not initiate physical contact" with Collins or Simpson, "had no weapon," and "did not demonstrate any assaultive behavior towards any officer." (*Id.* at 17, para. 97).

Taking Council's allegations as true, they satisfy both components of the Eighth Amendment excessive force inquiry. First, as to the subjective component, Council's allegations establish that Officer Collins and Officer Simpson "(1) did not act in good faith to maintain discipline and (2) used 'force maliciously or sadistically for the very purpose

of causing harm.'" *Muhammad*, 2026 WL 1895930 at *8 (quoting *Skrtich*, 280 F.3d at 1304–05). According to Council, he submitted to a strip search before objecting to his threatened placement in restrictive housing. (Doc. 85 at 16–17, paras. 94–96). In response, Collins and Simpson—without physical contact from Council—handcuffed and dragged Council by an arm and a leg across the dorm. (*Id.* at 16–17, paras. 96–97). In this scenario, the handcuffing and dragging of a compliant prisoner does not serve a "legitimate penological purpose." *See Sconiers*, 946 F.3d at 1266 (quoting *Graham v. Sheriff of Logan Cnty.*, 741 F.3d 1118, 1122–23 (10th Cir. 2013)). Thus, Collins and Simpson's alleged actions cannot be characterized as an attempt to maintain discipline. Instead, the operative complaint can be fairly read to show that Collins and Simpson handcuffed and dragged Council to punish him for failing to put down the September 2022 work strike.

The five *Sears* factors also counsel in favor of allowing the Eighth Amendment excessive force claim to proceed to discovery. *See Sears*, 922 F.3d at 1205. To start, Council alleges that he complied with the officer's request when he submitted to a strip search—obviating the need for the application of force. Further, Council did not pose a threat to the safety of staff or inmates given that he did not initiate or threaten physical contact with Officer Collins or Officer Simpson. Even if force was necessary, Council does not allege that Collins and Simpson attempted to "temper the severity of a forceful response"—rather, the force escalated without provocation. Although Council does not allege that he suffered major injuries, this Court's inquiry "focuses more on the force applied" rather than the severity of Council's injuries. *See Muhammad*, 2026 WL 1895930 at *7. Indeed, "slamming a person to the ground without penological justification certainly

offends common standards of decency." *Sconiers*, 946 F.3d at 1268. Council's allegations therefore satisfy the subjective component.

Second, as to the objective component, Officer Collins' and Officer Simpson's actions were "harmful enough" or "sufficiently serious" to violate the Constitution. *See Sconiers*, 946 F.3d at 1265. A panel of the Eleventh Circuit has held that "[t]he gratuitous use of force and infliction of pain without penological justification meets the objective harm standard for excessive force claims." *Muhammad*, 2026 WL 1895930 at *7. That holding echoes a longstanding prohibition. *See Skritch*, 280 F.3d at 1303 ("By 1998, our precedent clearly established that government officials may not use gratuitous force against a prisoner who has been already subdued"). Again, Council contends that he complied with Collins' and Simpson's strip search and did not initiate physical contact.

Even assuming that their handcuffing alone was not objectively excessive, Officer Collins and Officer Simpson's use of force did not stop when the need for it no longer existed. *See Muhammad*, 2026 WL 1895930 at *9 ("This ignores the fact that even if the violent takedown was not excessive, the use of force must stop when the need for it no longer existed."). Instead, Collins and Simpson purportedly "dragged" Council by an arm and a leg across the Limestone dormitory—well after he was subdued. (Doc. 85 at 16–17, paras. 94–96). Council's disagreement regarding his threatened placement in restrictive housing is not enough to greenlight this use of force. Therefore, Council's allegations also satisfy the objective component.

Turning to qualified immunity, it is undisputed that Officer Collins and Officer Simpson were exercising their discretionary authority. Thus, Council must

demonstrate: (1) Collins and Simpson violated his Eighth Amendment right to be free from excessive force and (2) that the Eighth Amendment violation was clearly established. *Caldwell*, 748 F.3d at 1099. Council meets both requirements. First, as explained above, Council sufficiently alleges that Collins and Simpson's use of force was: (1) not used in good faith to maintain discipline and, instead, used for the very purpose of causing harm; and (2) objectively harmful enough or sufficiently serious to violate the Constitution.

Second, Council demonstrates that his Eighth Amendment right to be free from excessive force was clearly established before the September 28, 2022 incident. *See, e.g.*, *Hudson,* 503 U.S. at 4 ("This case requires us to decide whether the use of excessive physical force against a prisoner may constitute cruel and unusual punishment [under the Eighth Amendment even] when the inmate does not suffer serious injury. We answer that question in the affirmative."); *Skrtich*, 280 F.3d at 1301 ("In this Circuit, a defense of qualified immunity is not available in cases alleging excessive force in violation of the Eighth Amendment, because the use of force 'maliciously and sadistically to cause harm' is clearly established to be a violation of the Constitution by the Supreme Court . . . ." (citation omitted)); *id.* at 1303; *Williams v. Burton*, 943 F.2d 1572, 1576 (11th Cir. 1991) (per curiam) ("[O]nce the necessity for the application of force ceases, any continued use of harmful force can be a violation of the Eighth . . . Amendment[], and any abuse directed at the prisoner after he terminates his resistance to authority is an Eighth Amendment violation."). Accordingly, Collins and Simpson are not entitled to qualified immunity at this early stage, and the case proceeds against them as to Council's Eighth Amendment excessive force claim.

**b. Brewer and Jones**

On November 28, 2022, Officer Brewer and Lieutenant Jones allegedly "assaulted [Council], threw him to the floor, cut his clothes off, and placed him on suicide watch." (Doc. 85 at 19, para. 121). Council "was discharged from suicide watch the next day." (*Id.*). Council alleges that the November 28, 2022 incident followed previous shakedowns beginning in October 2022. (*Id.* at 19, para. 120). At this stage, taking the allegations in the complaint as true, Council's excessive force claim against Brewer and Jones survives the Defendants' motion to dismiss. Like his claim against Officer Collins and Officer Simpson, Council's Eighth Amendment excessive force claim against Brewer and Jones satisfies both components of the Eighth Amendment excessive force inquiry.

As to the subjective component, Council sufficiently alleges that Officer Brewer and Lieutenant Jones "(1) did not act in good faith to maintain discipline and (2) used 'force maliciously or sadistically for the very purpose of causing harm.'" *Muhammad*, 2026 WL 1895930 at *8. Council alleges that during a shakedown—which appears to be routine based on Council's operative complaint—that Brewer and Jones assaulted him, threw him to the floor, and cut his clothing off. (Doc. 85 at 19, para. 121). Admittedly, Council's allegations do not paint a detailed portrait of the events before the November 28, 2022 shakedown. (*See id.* at 19, paras. 120–21). Despite the lack of vivid detail, taking his allegations as true, Brewer and Jones did not apply force "in a good faith effort to maintain or restore discipline." *Skrtich*, 280 F.3d at 1300. Throwing a prisoner to the floor and cutting his clothing off is unlikely to quell any potential danger to the safety of staff or inmates. *See Sears*, 922 F.3d at 1205. Further, based on Council's allegations, removing

his clothing would not serve a legitimate penological purpose. *See Sconiers*, 946 F.3d at 1266 (quoting *Graham*, 741 F.3d at 1122).

Although Council fails to allege that he suffered specific injuries, that does not preclude discovery. *See Sears*, 922 F.3d at 1205. Even if Officer Brewer and Lieutenant Jones needed to use force for a legitimate purpose, perhaps to place Council on the ground, "[t]he use of force must stop when the need for it to maintain or restore discipline no longer exists." *Skrtich*, 280 F.3d at 1304. The Defendants do not argue that Brewer and Jones removed Council's clothing to maintain or restore discipline, which counsels in favor of allowing this claim to proceed.

As to the objective component, Officer Brewer and Lieutenant Jones' actions were "harmful enough" or "sufficiently serious" to violate the Constitution. *See Sconiers*, 946 F.3d at 1265. Throwing a prisoner to the floor and cutting his clothing from his body meets the objective harm standard. *See Muhammad*, 2026 WL 1895930 at *7 ("The gratuitous use of force and infliction of pain without penological justification meets the objective harm standard for excessive force claims."); *see also Sconiers*, 946 F.3d at 1268 ("[S]lamming a person to the ground without penological justification certainly offends common standards of decency."). Brewer and Jones' conduct was therefore "'sufficiently serious' to constitute a denial of the 'minimal civilized measure of life's necessities.'" *Thomas v. Bryant*, 614 F.3d 1288, 1304 (11th Cir. 2010).

The Court now turns to qualified immunity. Because Officer Brewer and Lieutenant Jones were exercising their discretionary authority, Council must demonstrate that: (1) Brewer and Jones violated his Eighth Amendment right to be free from excessive force

and (2) that the Eighth Amendment violation was clearly established. *Caldwell*, 748 F.3d at 1099. Council satisfies both prongs. First, as explained above, Council sufficiently alleges that Brewer and Jones' alleged conduct violated his Eighth Amendment right to be free from excessive force. More specifically, Brewer and Jones' use of force was: (1) not a good faith attempt to maintain discipline and, instead, used for the very purpose of causing harm; and (2) sufficiently serious to violate the Constitution. Indeed, throwing a prisoner to the ground and removing his clothing by force violates the common standards of decency. *See Sconiers*, 946 F.3d at 1268.

Second, Council demonstrates that his Eighth Amendment right to be free from excessive force was clearly established before the November 28, 2022 incident. *See supra* Section V.B.3.a; *see, e.g.*, *Hudson,* 503 U.S. at 4; *Skrtich*, 280 F.3d at 1301; *id.* at 1303; *Williams*, 943 F.2d at 1576. Accordingly, Officer Brewer and Lieutenant Jones are not entitled to qualified immunity at this early stage, and this case proceeds against them as to Council's Eighth Amendment excessive force claim.

**c. Brewer**

On December 2, 2022, at approximately 3:00 a.m., Officer Brewer conducted a shakedown of Council's cell. (Doc. 85 at 19, para. 122). According to Council, he "asked that a supervisor observe the shakedown and . . . Brewer's interactions with [Council]." (*Id.* at 19, para. 123). Following his request, Brewer sprayed Council "in the face with pepper spray." (*Id.*). After applying the two-component framework, the Court finds that

Council sufficiently establishes another Eighth Amendment excessive force claim against Brewer.

As to the subjective component, Council sufficiently alleges that Officer Brewer's use of pepper spray was not applied in a good faith effort to maintain or restore discipline. *See Skrtich*, 280 F.3d at 1300. Council purportedly asked a supervisor to observe a shakedown. His request was met with pepper spray. (Doc. 85 at 19, para. 123). As pleaded, the triggering event for Brewer's administration of pepper spray was Council's request. A request for supervision does not implicate officer or inmate safety and would not necessitate the use of force. *See Sconiers*, 946 F.3d at 1268 ("punishing Sconiers for questioning . . . orders in this regard also may not be sustained as having a legitimate penological purpose."). Council's allegations are therefore sufficient at this stage to show that Brewer's use of pepper spray was maliciously and sadistically used to cause harm. *See Skrtich*, 280 F.3d at 1300.

The *Sears* factors inform the Court's findings—Officer Brewer did not need to use force, rendering the use of force disproportionate to Council's conduct. *Sears*, 922 F.3d at 1205. Moreover, Council's request did not threaten the safety of staff and inmates, and Brewer made no effort to temper the severity of the pepper spray's force. *Id.* There is no allegation that alternative measures were taken before Brewer deployed pepper spray.

Council fails to allege the extent of any injuries that he suffered, but again, the Court focuses more on the force applied. *Id.* ("The focus of our Eighth Amendment inquiry is on the nature of the force applied, not on the extent of the injury inflicted."); *see also Muhammad*, 2026 WL 1895930 at *7 ("Where prison officials maliciously and sadistically

apply force to cause harm, they 'always' violate contemporary standards of decency, even in the absence of 'significant injury.'") (quoting *Wilkins*, 559 U.S. at 37)). Accordingly, Council's allegations satisfy the subjective component.

Council's allegations also meet the objective component. Put simply, because Officer Brewer's conduct (as alleged) related to Council's non-threatening request, his use of pepper spray was a gratuitous use of force without a legitimate penological reason. In a similar context, the Eleventh Circuit held that a prisoner alleging that he was pepper sprayed without penological justification satisfied the objective component. *See Sconiers*, 946 F.3d at 1268 ("Pepper-spraying and slamming a person to the ground without penological justification certainly offends common standards of decency."); *see also Muhammad*, 2026 WL 1895930 at *7 ("The gratuitous use of force and infliction of pain without penological justification meets the objective harm standard for excessive force claims."). Consequently, Council's allegations satisfy the objective component.

The Court now analyzes whether Brewer is entitled to qualified immunity. Because neither party contests that Brewer was exercising his discretionary authority, Council must demonstrate that: (1) Brewer violated his Eighth Amendment right to be free from excessive force; and (2) that the Eighth Amendment violation was clearly established before the December 2, 2022 shakedown. *Caldwell*, 748 F.3d at 1099. Council meets both prongs.

First, as outlined above, Council sufficiently alleges that Officer Brewer's conduct violated his Eighth Amendment right to be free from excessive force. Namely that Brewer's use of pepper spray was: (1) not a good faith attempt to maintain discipline and,

instead, used for the very purpose of causing harm; and (2) sufficiently serious to violate the Constitution. *See Muhammad*, 2026 WL 1895930 at *8.

Second, Council demonstrates that his Eighth Amendment right to be free from excessive force was clearly established before the December 2, 2022 incident. *See supra* Section V.B.3.a; *see, e.g.*, *Hudson,* 503 U.S. at 4; *Skrtich*, 280 F.3d at 1301; *id.* at 1303; *Williams*, 943 F.2d at 1576. Consequently, Brewer is not entitled to qualified immunity at this early stage, and this case proceeds against him as to Council's Eighth Amendment excessive force claim.

**C. State Claims**

In addition to his federal claims, Council brings three claims under Alabama law: (1) assault and battery (Count IV); (2) intentional infliction of emotional distress (Count V); and (3) negligent retention or supervision (Count VI). Just like his federal claims, Council's state law causes of action are brought in singular counts against multiple defendants. The Defendants argue that all three-state law causes of action must be dismissed for failure to state or claim (Count V) and because they are entitled to state-agent immunity (Counts IV, V, and VI).[24] Council disagrees and contends: (1) that he states a claim for relief as to intentional infliction of emotional distress and (2) the Defendants violated Alabama law and are not protected by state agent immunity.

[24] Though the Defendants do not directly contend that Council fails to state a claim as to Counts IV and VI, determining such is obviously the first step in any immunity analysis. The Court therefore must also determine whether Council has stated a claim as to Counts IV and VI.

"State-agent immunity protects state employees, as agents of the State, in the exercise of their judgment in executing their work responsibilities." *Ex parte Hayles*, 852 So. 2d 117, 122 (Ala. 2002). An Alabama state agent sued in their personal capacity "*shall* be immune from civil liability . . . when the conduct made the basis of the claim" falls within any of the five following categories: "(1) formulating plans, policies, or designs"; "(2) exercising his or her judgment in the administration of a department or agency of government"; "(3) discharging duties imposed on a department or agency by statute, rule, or regulation"; "(4) exercising judgment in the enforcement of the criminal laws of the State"; or "(5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners." *Ex parte Cranman*, 792 So. 2d 392, 405 (Ala. 2000) (plurality op.) (emphasis in original); *see also Ex parte Butts*, 775 So. 2d 173, 178 (Ala. 2000) (majority adopting *Cranman* test).

Even if a state agent's conduct falls within any of the five *Cranman* categories, "state-agent immunity 'shall not' attach if 'the [s]tate agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.'" *Garcia v. Casey*, 75 F.4th 1176, 1191 (11th Cir. 2023) (quoting *Cranman*, 792 So. 2d at 405). Likewise, a state agent is not immune "when the Constitution or the laws of the United States, or the Constitution of [Alabama], or laws, rules, or regulations of [Alabama] enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise." *Cranman*, 792 So. 2d at 405.

Much like federal qualified immunity, Alabama state agent immunity uses a "'burden-shifting' process when a party raises the defense of State-agent immunity."

*Giambrone v. Douglas*, 874 So. 2d 1046, 1052 (Ala. 2003). "'A [s]tate agent asserting [s]tate-agent immunity 'bears the burden of demonstrating that the plaintiff's claims arise from a function that would entitle the [s]tate agent to immunity.'" *Ex Parte Kennedy*, 992 So. 2d 1276, 1282 (Ala. 2008). If the state agent makes that showing, "the burden then shifts to the plaintiff to show that one of the two categories of exceptions to [s]tate-agent immunity recognized in *Cranman* is applicable." *Id.*

The Court proceeds to discuss each claim in turn—beginning with Council's assault and battery claim.

**1. Assault and Battery: Count IV**

Council alleges that Officer Collins, Officer Simpson, Lieutenant Jones, Officer Brewer, and Officer Parker "are liable for assault and battery" based on their conduct during three separate incidents at Limestone. (Doc. 85 at 29, paras. 180–85). Under Alabama law, assault and battery are two distinct but related torts.[25] *See Surrency v. Harbison*, 489 So. 2d 1097, 1104 (Ala. 1986) (noting that a "successful assault becomes a battery" (quoting *Singer Sewing Machine Co. v. Methvin*, 63 So. 997, 1000 (1913))). To establish an assault and battery claim, Council must show "(1) that the defendant touched [Council]; (2) that the defendant intended to touch [Council]; and (3) that the touching was conducted in a harmful or offensive manner." *Ex parte Atmore Cmty. Hosp.*, 719 So. 2d 1190, 1193 (Ala. 1998).

[25] Council styles his cause of action as an "assault and battery" claim and the Court analyzes it as such. *See Simmons v. Frank Norton, LLC*, 2017 WL 3191094, at *8 (N.D. Ala. July 27, 2017) ("Assault and battery are frequently analyzed together because they involve overlapping elements and facts . . . .").

"The Alabama Supreme Court has largely equated qualified immunity with [state agent] immunity." *Cantu v. City of Dothan*, 974 F.3d 1217, 1236 (11th Cir. 2020) (quoting *Hunter v. Leeds*, 941 F.3d 1265, 1284 (11th Cir. 2019) (alteration in original)). "Under both Alabama law and federal law, the core issue is whether a defendant violated clearly established law." *Id.* (quoting *Sheth v. Webster*, 145 F.3d 1231, 1239 (11th Cir. 1998)). "That means the same facts that establish an officer is not entitled to qualified immunity 'also establish that [he] is not entitled to' state agent immunity." *Id.* (quoting *Hunter*, 941 F.3d at 1284).

Here, as to Officer Collins, Officer Simpson, Lieutenant Jones, and Officer Brewer, the allegations that give rise to Council's federal excessive force claims against these defendants also serve as the basis for his state law assault and battery claims. Those allegations, if proven, clearly satisfy the necessary elements of an assault and battery claim under Alabama law and constitute willfully malicious behavior. *See supra* Section V.B.3. Accordingly, Council sufficiently alleges assault and battery claims against these defendants. Additionally, at this early stage of the litigation, state agent immunity does not shield Officer Collins, Officer Simpson, Lieutenant Jones, and Officer Brewer from these claims.

This leaves only Officer Parker for further analysis. Council alleges that "[o]n October 15, 2023, . . . [Warden] Streeter accused [Council] of uploading a video onto social media." (Doc. 85 at 22, para. 144). Though the video was from years earlier and was not filmed at Limestone, "Streeter told . . . Parker to place [Council] in restrictive housing for unauthorized participation in social networking." (*Id.* at 22–23, paras. 145–47). Parker and

Officer Brewer entered Council's cell and told him "they were placing him in restrictive housing because he had violated ADOC's social media policy." (*Id.* at 23, para. 148). "*Without immediately complying*, [Council] asked, '[f]or what?' He . . . did not physically touch . . . Parker or Brewer, and did not actively or forcibly resist them." (*Id.* at 23, para. 149 (emphasis added)). "Nevertheless, . . . Parker sprayed [Council] in the face with SABRE Red Phantom Cell Buster pepper spray." (*Id.* at 23, para. 150). This resulted in the burning of Council's face and left ear. (*Id.* at 23, para. 152).

Because Council asserts an assault and battery claim against Officer Parker under Alabama law, his allegations must sufficiently allege that that the touching "was conducted in a harmful or offensive manner." *Ex parte Atmore Cmty. Hosp.*, 719 So. 2d at 1193. In this Circuit, courts "must . . . give a 'wide range of deference to prison officials acting to preserve discipline and security.'" *Cockrell*, 510 F.3d at 1311 (quoting *Bennett v. Parker*, 898 F.2d 1530, 1533 (11th Cir. 1990), *abrogated on other grounds by Williams v. Radford*, 64 F.4th 1185, 1198–99 (11th Cir. 2023)). And according to Council's own allegations, he admits to being noncompliant with unspecified commands from Officer Parker while both men stood inside of Council's cell, resulting in the deployment of pepper spray. (Doc. 85 at 23, para. 149 ("Without immediately complying, [Council] asked, '[f]or what?'")). The use of pepper spray by Parker thus had a legitimate penological justification. These allegations are, therefore, insufficient to constitute an assault and battery claim under Alabama law and the claim against Officer Parker is due to be dismissed for failure to state a claim.

**2. Intentional Infliction of Emotional Distress: Count V**

Council alleges that Lieutenant Pelzer, Officer Charley, Lieutenant Gilbert, and Officer Bright "intentionally inflicted emotional distress on [him] by threatening to assault or kill him, attempting to incentivize other inmates to attack [him], as well as leaving him in a restrictive housing cell covered in pepper spray, which are each extreme and outrageous conduct that were intentionally inflicted to cause [him] severe emotional distress." (Doc. 85 at 29, para. 186). Under Alabama law, outrage and intentional infliction of emotional distress are one and the same. *Wilson v. Univ. of Ala. Health Servs. Found., P.C.*, 266 So. 3d 674, 675 n.1 (Ala. 2017). To recover, a plaintiff must show that the defendant's conduct: (1) "was intentional or reckless," (2) "was extreme and outrageous," and (3) "caused emotional distress so severe that no reasonable person could be expected to endure it." *Id.* at 676. "The conduct complained of must 'be so extreme in degree as to go beyond all possible bounds of decency and be regarded as atrocious and utterly intolerable in a civilized society.'" *Id.* at 676–77 (quoting *Green Tree Acceptance, Inc. v. Standridge*, 565 So. 2d 38, 44 (Ala. 1990)).

The Alabama Supreme Court has emphasized time and again that "the tort of outrage is an *extremely limited cause of action* and will lie in circumstances demonstrating only *the most egregious conduct*." *21st Mortg. Corp. v. Robinson*, 429 So. 3d 381, 392 (Ala. 2024) (emphases in original). "It is so limited that th[e Alabama Supreme] Court has recognized it in regard to only three kinds of conduct: (1) wrongful conduct in the family-burial context; (2) barbaric methods employed to coerce an insurance settlement; and (3) egregious sexual harassment." *Potts v. Hayes*, 771 So. 2d 462, 465 (2000) (internal

citations omitted); *accord Callens v. Jefferson Cnty. Nursing Home*, 769 So. 2d 273, 281 (Ala. 2000).

While the outer bounds of the tort may extend a bit beyond these three discrete circumstances, it does not extend very far, and any extension would appear appropriate only in the presence of truly monstrous facts. For instance, the Alabama Supreme Court affirmed "a judgment on a tort-of-outrage claim asserted against a family physician who, when asked by a teenage boy's mother to counsel the boy concerning his stress over his parents' divorce, instead began exchanging addictive prescription drugs for homosexual sex for a number of years, resulting in the boy's drug addiction." *Little v. Robinson*, 72 So. 3d 1168, 1172–73 (Ala. 2011) (citing *O'Rear v. B.H.*, 69 So. 3d 106 (Ala. 2011)); *see also Livingston v. Marion Bank & Tr. Co.*, 30 F. Supp. 3d 1285, 1324 (N.D. Ala. 2014) (permitting the plaintiff's outrage claim to go to a jury where the record demonstrated that the plaintiff was subjected to "egregious sexual harassment," including one antagonist who, after learning that the plaintiff "had been raped at knife point," "us[ed] his power as [the defendant]'s highest-ranking employee to coerce [the plaintiff] into answering questions seeking all of the intimate details of how she was raped, including what sexual position she was in, what clothing she was wearing, where her attacker held the knife, and what she was thinking during the episode").

Though Council's allegations of threats and improper placement in restrictive housing are serious, it is obvious to the Court that these allegations do not fit within the limited parameters of this cause of action under Alabama law. Further, Council does not present a compelling argument for extending the outer bounds of this tort. (*See* doc. 91 at

75 (describing generally how Council fears for his safety while incarcerated (citing doc. 85 at 4, para. 6; *id.* at 20, para. 128))). As such, the Court will not extend a state law claim that the Alabama Supreme Court has repeatedly emphasized is "extremely limited." *Potts*, 771 So. 2d at 465. The Court thus concludes that Council has failed to state a claim of intentional infliction of emotional distress and the claim is due to be dismissed.

**3. Negligent Retention or Supervision: Count VI**

Finally, Council alleges that Commissioner Dunn, Commissioner Hamm, Coordinator Price, Coordinator Ellington, Warden Toney, Warden Streeter, and Warden Crabtree "negligently retained or supervised Defendant Pelzer, foreseeably causing him to commit the torts of intentional infliction of emotional distress described" in Count V. (Doc. 85 at 30, para. 194). Council's intentional infliction of emotional distress claim is due to be dismissed. *See supra* Section V.C.2. Because Council entirely predicates his negligent retention or supervision claim on his due-to-be-dismissed intentional infliction of emotional distress claim, he fails to state a claim and Count VI is also due to be dismissed.

## VI. LEAVE TO AMEND

Regardless of the applicability of any immunity, the Court will not allow Council to replead his claims dismissed for failure to state a claim. This is Council's third amended complaint in nearly three years and he has been represented by counsel throughout this litigation. There is, therefore, no indication in Council's response or otherwise that he can or will correct his pleading issues if given another opportunity to do so. Additionally, Council did not request an opportunity to replead his claims. *See Wagner v. Daewoo Heavy*

*Indus. Am. Corp.*, 314 F.3d 541, 542 (11th Cir. 2002) (en banc) (holding that when a district court grants a Rule 12(b)(6) dismissal motion, it "is not required to grant a plaintiff leave to amend his complaint sua sponte when the plaintiff, who is represented by counsel, never filed a motion to amend nor requested leave to amend before the district court").

## VII. CONCLUSION

For the foregoing reasons, the Defendants' motion (doc. 87) is GRANTED in part and DENIED in part, and it is ORDERED as follows:

1. All claims against Officer Dozier are DISMISSED without prejudice for failure to prosecute;

2. All claims against Commissioner Hamm, Commissioner Dunn, Coordinator Price, Coordinator Ellington, Warden Toney, Warden Streeter, Warden Crabtree, Lieutenant Caldwell, Officer Bright, Officer Charley, Lieutenant Whitfield, Officer Parker, and Lieutenant Gilbert are DISMISSED with prejudice;

3. Council's state law claims for intentional infliction of emotional distress (Count V) and negligent retention or supervision (Count VI) are DISMISSED with prejudice;

4. Council's First Amendment retaliation claims (Count I) against Officer Brewer and Lieutenant Jones are DISMISSED with prejudice.

Accordingly, the following claims will proceed: (1) the First Amendment retaliation claim (Count I) against Lieutenant Pelzer; (2) the deliberate indifference claim (Count II) against Lieutenant Pelzer; (3) the Eighth Amendment excessive force claims (Count III) against Officer Collins, Officer Simpson, Officer Brewer, and Lieutenant Jones; and (4) the

state law assault and battery claims (Count IV) against Officer Brewer, Lieutenant Jones, Officer Collins, and Officer Simpson. These remaining defendants will have another opportunity to raise the defenses of qualified immunity and state agent immunity at summary judgment with the benefit of an evidentiary record. For now, this case will proceed with Council's remaining claims.

DONE this 29th day of September, 2026.

/s/ Emily C. Marks
EMILY C. MARKS
UNITED STATES DISTRICT JUDGE